UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KAY MESIA )<br>571 Market Street East )<br>Gaithersburg, MD 20878 )<br>  )<br>  Plaintiff, )<br>  )<br>  v. )<br>  )<br>AARP SERVICES, INC. )<br>601 E Street NW )<br>Washington, DC 20049 )<br>  )<br>  Defendant. )<br>  ) | Civil Action No. ____<br><br>Jury Demand<br><br>ECF Case |

**COMPLAINT AND JURY DEMAND**

Plaintiff, Kay Mesia, brings this action against her former employer, AARP Services Inc. ("ASI" or "Defendant") for gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e-1, *et seq.*

I.   **INTRODUCTION**

In 2012, ASI hired Ms. Mesia as Vice President for its largest line of business, Health Products and Services ("HPS"). She reported to ASI's Senior Vice President for Health Products and Services, David Mathis, who described himself as a "good old boy" and treated female ASI staff, including Ms. Mesia, as second-class employees. In late 2013, Ms. Mesia reported her concerns to ASI's Human Resources manager and directly to Mr. Mathis. She met hostility, not corrective action. Less than two months afterwards, ASI eliminated Ms. Mesia's position, supposedly due to a "lack of work." But just a week before, Ms. Mesia had authored a planning report, which Mr. Mathis approved, which predicted that work and revenue at HPS would increase throughout 2014 and beyond. "Lack of work" was a pretext for discrimination

and retaliation.

## II. JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

2. This Court has personal jurisdiction over the Defendant, pursuant to D.C. Code Ann. § 13-423(a)(3) (2001 ed.).

3. Venue lies in this court, pursuant to 28 U.S.C. § 1391(b)(1) and 42 U.S.C. § 2000e-5, because the events giving rise to Ms. Mesia's claims occurred in the District of Columbia, at Defendant's offices.

## III. PARTIES

4. Plaintiff Kay Mesia resides at 571 Market Street East, Gaithersburg, MD 20878 and is domiciled in the State of Maryland. From August 6, 2012 to January 23, 2014, she worked for Defendant as Vice President of Health Products and Services (HPS).

5. Defendant AARP Services, Inc. ("ASI"), incorporated under the laws of Delaware, is a for-profit corporation wholly owned by AARP. AARP was formerly known as the American Association of Retired Persons. ASI's offices and principal place of business are located at 601 E Street, NW, Washington, DC 20049.

## IV. FACTUAL ALLEGATIONS

### A. Kay Mesia, an experienced health insurance executive, joins ASI.

6. Traditionally – and 2012 to 2014 was no exception - HPS generated the majority of ASI's revenue.

7. Until August of 2012, Senior Vice President David Mathis ("Mathis") directed HPS. Mr. Mathis's 2011 last performance review, the last one he received before August 2012,

noted he needed to "right the ship" for HPS and stated that ASI should hire an HPS Vice President within the next quarter.

8. ASI recruited Ms. Mesia to become the HPS VP. She had extensive expertise in for-profit health insurance. She had been an auditor and had worked in an executive capacity in the health insurance field since the year 2000.

9. During her job interviews, several ASI officers told her they believed HPS was underperforming and dysfunctional.

10. On August 6, 2012, Ms. Mesia began working for ASI as the Vice President of HPS. She directed HPS' development and management of health insurance products and contracts with "Fortune 100" companies and other large corporations. No other ASI vice president was responsible for as significant a share of its business.

B. **ASI treats women differently in pay, opportunity, and work environment.**

11. Ms. Mesia noted unwarranted pay differentials among managerial staff. Ms. Mesia reported to Senior Vice President David Mathis and two directors reported to her. One subordinate director was male and had been in HPS before Ms. Mesia arrived. Ms. Mesia hired the second director, a female, from another part of ASI. The female director had been with ASI much longer than the male director and had a more challenging portfolio to manage. When she hired the female director, Ms. Mesia sought to raise her salary to a level close to the male peer, who was paid tens of thousands of dollars more. Mr. Mathis and ASI Human Resources refused to offer a comparable salary.

12. Ms. Mesia observed over time that the female director performed at a high level. The male director was underperforming, which other ASI senior executives confirmed. Ms. Mesia believed that the continued pay disparity was inequitable. She unsuccessfully attempted

to fix this pay inequity by speaking with ASI's Senior Human Resources Business Operations Manager, Rona Bloom ("Bloom"), and with Mr. Mathis. However, her recommendations to increase the female director's compensation went unheeded.

13. In addition, gender-based stereotyping was manifest in HPS. For example, in a January 2013 meeting with HPS's executive team, Mr. Mathis insisted that Ms. Mesia take notes and schedule future meetings. Ms. Mesia outranked virtually every male employee in the conference room except for Mr. Mathis, who in effect asked her to act as a clerical worker.

14. Next, Mr. Mathis and Ms. Bloom led a so-called "team-building" exercise in February 2013. By design, the HPS staff was asked to reveal personal information to their co-workers. When it was her turn, Ms. Mesia stated that she tried to base her judgments on business considerations and facts, not emotions. Mr. Mathis responded "just by the fact that you're a woman, you're emotional." He repeated this statement, with small variations, at team meetings and in one-on-one meetings with Ms. Mesia.

15. At team meetings, Mr. Mathis ignored or missed suggestions Ms. Mesia made, then later accepted the same or nearly the same suggestions made by male employees.

16. Mr. Mathis also expressed a stereotypical view of women's role in the business world and an outdated belief that women do not watch or play sports. For example, in June 2013, ASI was planning a corporate golf outing in South Carolina called the "Cowboy Way." It was Mr. Mathis's responsible to advise on or determine which contacts at HPS' vendors would be invited. Ms. Mesia, a Vice President who does play golf, was not part of the invitation process and she was not invited. Mr. Mathis did not include the only female in a group of vendor executives. When Ms. Mesia asked Mr. Mathis about excluding a woman from one of the vendors, Mr. Mathis said the female vendor executive would not want to play golf. Ms.

Mesia and a female member of her staff said that the exclusion didn't look right. Only then did Mr. Mathis include the female executive on the list of HPS contacts to invite. Subsequently, when a male executive from UnitedHealth Group traveled to Washington, D.C. around August 2013 for a meeting and dinner, Mr. Mathis only invited the male director who reported to Ms. Mesia — bypassing both Ms. Mesia and the female director, who also worked with UnitedHealth Group. Mr. Mathis also expressed surprise at the female HPS director's avid interest in football, as though he had never before known a female football fan.

17. Mr. Mathis' application of gender stereotypes included the hiring of administrative staff. In August 2013, when Mr. Mathis and Ms. Mesia reviewed resumes to hire a new administrative assistant, he stated that he would only consider women for the clerical position.

18. Early in her employment with ASI, Ms. Mesia was disquieted by Mr. Mathis comparing her appearance to a blonde television anchorwoman. Later, during a reception at a national meeting, Mr. Mathis made a misogynistic remark about a high-ranking female executive at one of the largest companies in the country. Ms. Mesia told him the remark was "not right."

C. **Ms. Mesia complained about gender discrimination to HR and to her boss.**

19. During or about the week of November 18, 2013, two female ASI employees complained to Ms. Mesia that they believed there was a lack of opportunity for women and favoritism towards men in ASI. These employees mentioned Mr. Mathis excluding women from social events, such as golf and providing male executives more access to major ASI business partners. They described ASI as having a "glass ceiling" limiting women and being run by an "old boys club." Ms. Mesia encouraged the women to report their concerns to HR and the Board, but they declined. Ms. Mesia responded that she believed as a senior manager that she

was obliged to raise these concerns with Human Resources and Mr. Mathis. She agreed to keep these women's identities confidential.

20. Ms. Mesia met with Ms. Bloom, the Human Resources representative, during or about the week of November 25, 2013. Ms. Mesia described her colleagues' concerns and reiterated her prior concerns about pay inequity between the two directors working under her. Ms. Bloom did not acknowledge the concern. Ms. Bloom further stated that ASI would not address issues of pay inequity until after issuing 2013 performance evaluations, which would not be for several more months.

21. Ms. Bloom then deflected the issue Ms. Mesia had raised by saying "you know, other people have complained about you." Ms. Mesia asked for details and received none. Ms. Mesia then returned to her original concern, asking for a way for HPS to address the concerns about discrimination. She said that she would address the issue with Mr. Mathis and that under principles of corporate governance, she thought that Ms. Bloom should advise the CEO of the issue and the CEO should advise the Board.

22. As stated above, Ms. Bloom would not tell Ms. Mesia who had supposedly complained or any of the details of their complaints. Ms. Mesia's performance evaluation did not reflect any complaints, either.

23. Around the first week of December 2013, Ms. Mesia informed Mr. Mathis "there are employees in this office who do not think that female employees are being treated equitably." Mr. Mathis refused to commit to any response or action. He was visibly angry and challenged Ms. Mesia: "Is this you we're talking about Kay, or is this an actual complaint?" Shortly afterwards, Mr. Mathis cancelled and rescheduled several weekly one-on-one meetings with Ms. Mesia. Ms. Mesia had never before had this level of difficulty getting time to speak to him.

24.     Between late November 2013 and January 23, 2014, when ASI suddenly terminated Ms. Mesia, Ms. Bloom did not investigate the concerns Ms. Mesia expressed.

D. **After Ms. Mesia complained, ASI terminated her employment, citing a fictitious "lack of work."**

25.     HPS met its financial targets for 2013.

26.     Mr. Mathis stated to the D.C. Office of Human Rights that at the time she was terminated in early 2014, Mr. Mathis had prepared a review rating her "Meets," *i.e.* "meets expectations" but had not given her the rating.  Mr. Mathis himself earned a "Meets" rating from his supervisor, Mr. Wider, for 2011, 2012, and 2013.

27.     During the week of January 13-17, 2014, Ms. Mesia and her organization mapped out a 2014 HPS Work Plan, which Mr. Mathis reviewed and approved.  Operational objectives, goals, and workload distribution for 2014 reflected such a steep projected upward trend that ASI planned to use outside independent contractors to keep up.  Major provider contracts had been renewed or recently renegotiated.  The recent renewal of the largest insurer's contract had extended that relationship to 2020 and revenues and workload relating to that agreement were projected to grow substantially throughout 2014.

28.     At that time, HPS accounted for roughly 65 to 70 percent of ASI's revenues.

29.     Mr. Mathis scheduled a meeting with Ms. Mesia for the next Thursday, January 23, 2014 -- approximately seven weeks after Ms. Mesia had registered sex discrimination complaints.  At the meeting, Ms. Bloom joined Mr. Mathis, who asserted that ASI had decided to "eliminate her position."  He said that termination was because of a purported "lack of work" to sustain her role as VP.  He told her that "I recommended, and [ASI CEO and President] John [Wider] approved, that your position be eliminated."  Mr. Mathis denied there was any other reason, such as job performance, for her termination.

30. On February 7, 2014, Ms. Mesia sent a memorandum to Ms. Bloom asking for review of the circumstances of elimination of her job, and particularly whether the "lack of work" excuse was pretextual and the motivation was retaliatory. Ms. Mesia reminded Ms. Bloom that Mr. Mathis had claimed he had recommended job elimination and Mr. Wider had approved it. Ms. Bloom wrote back to Ms. Mesia on February 10th. She did not deny that Mr. Mathis had said in her presence that he had recommended eliminating Ms. Mesia's job. She did not state that she would investigate the "lack of work" excuse, either. Instead, she stated she would investigate Mr. Mathis's comments, which Ms. Mesia later described as an "after the barn door" investigation.

31. Ms. Mesia wrote Ms. Bloom again on February 11, 2014, to provide additional examples of sexist behavior and the names of employees with relevant knowledge. She again asked Ms. Bloom to investigate whether Mr. Mathis had eliminated her job as an act of retaliation. Ms. Bloom called Ms. Mesia on February 26, 2014, and said that her "investigation" had revealed no retaliation and no discrimination.

32. Ms. Mesia is aware of no other executive ASI terminated during that time period. Of the three Vice Presidents for the three key lines of business, Ms. Mesia was the only female and the only one terminated.

   **E.  After firing Ms. Mesia, ASI changes its explanations.**

33. On August 19, 2014, Ms. Mesia filed a complaint under Title VII and the District of Columbia Human Rights Act with the District of Columbia Office of Human Rights ("DCOHR"), which was cross-filed with the Equal Employment Opportunity Commission. DCOHR conducted an investigation, which required ASI to provide a written position statement ("Position Statement"). DCOHR also took statements from 9 ASI employees.

34. In its Position Statement, ASI claimed that Mr. Wider and Mr. Mathis decided to eliminate the Vice President position and terminate Ms. Mesia's employment and that they had obtained approval from Ms. Bloom. Contradicting ASI's assertion, Ms. Bloom never claimed that she had approved the decision.

35. In its Position Statement, ASI also asserted that at a meeting to "calibrate" employee ratings, several unnamed senior managers had told Mathis that "Ms. Mesia was a poor manager of her subordinates and lacked flexibility, empathy, and respect in her dealings with them." ASI also asserted that several of them purportedly claimed that "they did not like dealing with [Ms. Mesia] and avoided doing so." ASI also asserted that several of these executives had stated that although HPS had "achieved some favorable outcomes, most of the work was being done by the directors who reported to Ms. Mesia."

36. Such claims had never surfaced before over Ms. Mesia's past 18 months of employment. Half the executives attending the calibration meeting had no direct contact with Ms. Mesia's subordinates, and she had limited interaction with theirs. Thus those executives would have lacked knowledge of her management style or accomplishments. The 2012 performance review that Ms. Mesia received found that she met expectations, the 2013 performance review that Mr. Mathis had prepared for Ms. Mesia stated that she had met expectations, and Mr. Mathis and Ms. Bloom told that she was being terminated based on "lack of work," not "poor performance."

37. In his statement to DCOHR, Mr. Mathis claimed that he did not agree with Mr. Wider's decision to terminate Ms. Mesia and claimed that he had offered to resign instead of ASI terminating her.

38. On September 21, 2015, DCOHR found reasonable cause to believe that ASI had discriminated against and retaliated against Ms. Mesia by terminating her.

39. On October 14, 2015, ASI requested reconsideration of the DCOHR decision. In requesting that DCOHR reconsider its decision, ASI repeated that Mr. Mathis was not a decision-maker behind Ms. Mesia's termination and that its CEO actually was the decision-maker. ASI did not state, however, that Mr. Mathis had dissented from the decision.

40. Thus, ASI and David Mathis stated at least three different positions for him related to firing Ms. Mesia: being the recommending official, being a co-decision-maker, and acting as a dissenter.

41. On February 26, 2016, DCOHR denied ASI's request for reconsideration.

42. On April 8, 2016, the Equal Employment Opportunity Commission issued Ms. Mesia a notice of right to sue. *See* Exhibit A, attached.

**V.  CAUSES OF ACTION.**

**COUNT ONE**
**SEX DISCRIMINATION**
**TITLE VII OF THE CIVIL RIGHTS ACT**
**TITLE 42 U.S.C. § 2000e-2**

43. Plaintiff incorporates, as though restated here, each of the allegations stated in paragraphs 1 through 42 above.

44. Title VII prohibits employers from terminating an employee because of gender.

45. Defendant ASI is an employer covered by Title VII.

46. Ms. Mesia's supervisor, Mr. Mathis, treated her and other female employees differently than male employees in similar roles and engaged in the sex stereotyping and gender-based comments and actions set forth above. ASI's termination of Ms. Mesia, and the several untrue and shifting explanations it has offered, neither make business sense nor are truthful. They

are, instead, pretexts for gender-discrimination, in violation of 42 U.S.C. § 2000e-2.

47. ASI's wrongful actions have caused and will cause Ms. Mesia pecuniary losses, in the form of lost salary, benefits and future earnings, and non-pecuniary losses, including humiliation, shame and emotional distress.

48. ASI's discriminatory actions were willful, reckless, and malicious.

## COUNT TWO
## RETALIATION
## TITLE VII OF THE CIVIL RIGHTS ACT
## TITLE 42 U.S.C. § 2000e-3

49. Plaintiff incorporates, as though restated here, each of the allegations stated in paragraphs 1 through 48 above.

50. Under Title VII, it is illegal for an employer to discharge an employee because she has opposed any practice of unlawful employment discrimination.

51. Ms. Mesia engaged in protected activity under Title VII by seeking pay equity for her female subordinate, by opposing sex stereotyping remarks by her supervisor, and by reporting to Human Resources and her supervisor in November 2013 and in December 2013 concerns she and other female employees had about discriminatory gender-based favoritism and preferential treatment.

52. The Human Resources manager and Plaintiff's supervisor responded to Ms. Mesia's report of the female employees' concerns with hostility.

53. Less than two months after Ms. Mesia made this report, ASI fired her.

54. ASI has given several inconsistent excuses for terminating Ms. Mesia, showing that its excuses are pretexts for retaliation.

55. As a result of ASI's wrongful and retaliatory actions, Ms. Mesia lost and will continue to lose salary, benefits and future earnings and experience humiliation, shame and emotional distress.

56. ASI's retaliatory actions were willful, reckless, and malicious.

## VI. JURY TRIAL DEMAND

Plaintiff demands trial by jury or all issues so triable.

## VII. PRAYER FOR RELIEF

NOW WHEREFORE Plaintiff prays that this Honorable Court:

A. Award judgment on her behalf against the Defendant;

B. Award her compensatory damages to compensate for pain, and suffering, in an amount to be determined by a jury;

C. Award her back pay and lost benefits;

D. Award her reinstatement, or front pay for future economic loss in lieu of reinstatement;

E. Award her punitive damages from Defendant in an amount to be determined by a jury;

F. Award her pre- and post-judgment interest;

G. Award her costs of litigation, including attorney's fees and expert witness fees;

H. Declare that Defendant's conduct was in violation of Title VII; and

I. Award her all other relief this Court deems just.

Respectfully submitted,

/s/
_____
David Wachtel, D.C. Bar # 427890
Trister, Ross, Schadler & Gold, PLLC
1666 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20009
(202) 328-1666 ext. 1337
(202) 204-5946 (fax)
dwachtel@tristerross.com

/s/
_____
Stephen C. Leckar, D.C. Bar # 281691
Kalbian Hagerty, LLP
888-17th Street, N.W., Tenth Floor
Washington, D.C. 20006
(202) 742-4242
(202) 223-6625 (fax)
sleckar@kalbianhagerty.com

*Attorneys for Plaintiff Kay Mesia*

DATED: May 24, 2016